IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ROBBIN KOVACH,<br><br>       Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br><br>       Defendant. | CASE NO. 1:25-cv-2506<br><br>MAGISTRATE JUDGE<br>JAMES E. GRIMES JR.<br><br>**MEMORANDUM OPINION<br>AND  ORDER** |

Plaintiff Robbin Kovach filed a complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying her application for supplemental security income benefits. Doc. 1. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties consented to my jurisdiction in this case. For the following reasons, I affirm the Commissioner's decision.

**Procedural background**

In September 2023, Kovach filed an application for disability insurance benefits alleging a disability onset date[1] of June 1, 2014.[2] *See* Tr. 62. Kovach

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[2]     Although Kovach's application materials alleged an onset date of June 1, 2014, *see e.g.*, Tr. 61–62, 73–74, the ALJ and Kovach's counsel stated that Kovach's onset date was when she filed her application, *see* Tr. 43. Because it

claimed that she was disabled and limited in her ability to work due to: "diabetes, high blood pressure, learning disability, extreme cognitive deficiency, osteoarthritis, and arthritis in knees." *See id*. The Commissioner denied Kovach's application initially and on reconsideration. *See* Tr. 61, 73.

In July 2024, Kovach requested a hearing. Tr. 106. In March 2025, Administrative Law Judge ("ALJ") Joseph Hajjar held a telephonic hearing. *See* Tr. 39. Kovach appeared, testified, and was represented by counsel at the March 2025 hearing. Tr. 44–55. Qualified vocational expert William Braunig also testified. Tr. 56–60. In April 2025, the ALJ issued a written decision finding that Kovach was not entitled to benefits. Tr. 20.

In April 2025, Kovach appealed the ALJ's decision to the Appeals Council. *See* Tr. 223. In October 2025, the Appeals Council denied Kovach's appeal, making the ALJ's April 2025 decision the final decision of the Commissioner. Tr. 1; *see* 20 C.F.R. § 404.981.

Kovach timely filed this action in November 2025. Doc. 1. In it, she presents two issues for review:

> 1. Whether substantial evidence fails to support the ALJ's determination that Ms. Kovach can perform a range of light work.

---

does not change the outcome of this decision, the Court uses the onset date listed in Kovach's materials, while acknowledging the agreement below that the earliest Kovach could be considered for benefits is September 6, 2023, the date of her application. *See id*.; *see also* Tr. 20 (noting, in apparent scrivener's error, that Kovach's onset date was September 6, 2022, and stating that Kovach was not disabled since September 6, 2023).

      2.      Whether the ALJ committed reversible error in finding that Ms. Kovach could tolerate frequent, rather than occasional, interactions as identified by social security's psychological consultants.

Doc. 10, at 1.

**Evidence**[3]

*Personal and Vocational Evidence*

Kovach was born in November 1970, making her approximately 43 years old on the alleged onset date. Tr. 269. She completed high school. Tr. 263.

*Medical Evidence*

The ALJ summarized the medical evidence as follows:

> Medical records document the claimant's spine disorder, osteoarthritis of the knees, diabetes mellitus, obesity, hyperlipidemia and hypertension.
>
> In September 2023, the claimant presented to her physician requesting a letter stating that she was unable to work because of her knee pain. Ex. 4F/51. Nonetheless, the claimant had a normal physical exam and a normal gait. She was referred to physical therapy for the disability form, advised to take naproxen as needed for pain, and advised with regard to knee stretches. Ex. 4F/53-54.
>
> In November 2023, and February 2024, the claimant presented for a routine diabetic foot check and care. Exs. 4F/25; 12F/27. The claimant's A1C was 7.0. She reported no tingling in either foot or open areas. Notes indicated that the claimant's diabetes was controlled by diet, exercise, oral medication, and Trulicity. Exs. 4F/25; 12F/27.

---

[3] The recitation of evidence is not intended to be exhaustive and is generally limited to the evidence cited in the parties' briefs and relevant to their arguments.

In February 2024, the claimant reported that she had knee pain but had no other complaints. Ex. 12F/37. The claimant had a normal gait, and a normal physical exam. Ex. 12F/44. In March 2024, the claimant's body mass index was 33.23. Ex. 9F/12.

In April 2024, the claimant presented with back pain, severity level of 4. On exam, the claimant's blood pressure was 130/79 and her body mass index was 31.22. She had a normal gait and otherwise normal physical exam. Ex. 12F/9-10. The claimant was assessed with low back pain, advised to use heat and ice, SAID and Tylenol as directed, and lidocaine patches. Ex. 12F/11.

In May 2024, imaging of the claimant's right knee showed moderate tricompartmental joint space narrowing. Imaging of the claimant's left knee showed moderately decreased medial/lateral joint spaces. Patellofemoral osteophytes were appreciated. Ex. 13F/3.

In June 2024, the claimant presented for follow up with regard to her diabetes mellitus, hyperlipidemia and hypertension. Notes indicated that the claimant was in a normal state of health. She reported that she had back pain but denied such pain at the time. Ex. 17F/2. On exam, the claimant's blood pressure was 119/76 and her body mass index was 29.48. She had a normal gait and otherwise normal physical exam. Ex. 17F/8.

In July 2024, the claimant underwent an occupational therapy evaluation. Ex. 18F/1-9. The claimant was cooperative and able to follow directions and verbalize concerns. The claimant was assessed with good upper and lower extremity range of motion and flexibility, good upper and lower extremity strength, good trunk mobility, good lift and carry tolerance for medium physical demand classification, good knowledge and application of body mechanics with lifting tasks, good stand tolerance and functional coordination and dexterity.

Ex. 18F/8. The therapist asserted the following problems as interfering with vocational performance: decreased workplace tolerance; decreased lift and carry tolerance for heavy work tasks; decreased sitting tolerance; decreased knowledge of coping skills for return to work; decreased ability to manage pain symptoms; and decreased knowledge and/or application of appropriate pain management. Ex. 18F/8.

In August 2024, the claimant's A1C was 7.7. Notes indicated that the claimant's symptoms were stable, that she was following a generally healthy diet, and that her overall glucose range was 180-200 mg/dl. There was no polydipsia or polyuria. She was treated with medication. Ex. 21F/42.

In October 2024, imaging of the claimant's lumbar spine showed severe degenerative disc disease at L3-L4, L4-L5, and L5-S1. No spondylolisthesis. Ex. 21F/21. Notes indicated that the claimant had only gone to 2 physical therapy sessions and so needed the claimant to compete more physical therapy to determine if her low back pain was improving. Ex. 21F/21. On exam, the claimant had reduced strength in her left knee flexion and extension, but full strength in her right knee. Ex. 21F/29. The claimant was assessed with chronic back pain, left knee pain and osteoarthritis. Ex. 21F/21.

In December 2024, the claimant's A1C was 7.8. Her symptoms continued to be assessed as stable, without diabetic complications. Ex. 23F/4-5.

In January 2025, the claimant's body mass index was 33.21. Ex. 24F/18.

The claimant has also been assessed with hypertension and hyperlipidemia, treated with medication. Ex. 4F/21, 60. Records indicate that the claimant was encouraged to maintain a heart healthy diet, exercise, continue lifestyle modification of weight management, and continue taking prescribed medication. Ex. 4F/60.

5

Medical records document the claimant's major depressive disorder. The claimant reported a history of depression and anxiety. Ex. 1F/9. She endorsed feeling down, and feelings of worthlessness/guilt, anhedonia, and low self-esteem. Ex. 1F/9. In September 2023, notes indicated that the claimant's depression and anxiety had improved. She requested a letter that she was unable to work because of knee pain and unable to keep up with her production requirements. Ex. 4F/51. She denied anxious or depressive feelings. Ex. 4F/51. She was advised to continue relaxation techniques, like yoga, avoid caffeine, and continue medication regimen and exercise routine. Ex. 4F/54.

In January 2024, notes indicated that the claimant's mental health was managed by her primary care physician. On exam, the claimant was oriented, had normal language, and poor concentration, Ex. 1F/9, 12. In February 2024, the claimant had a Patient Health Questionnaire-9 score of 9 indicating mild depression. Ex. 6F/32. In March 2024, the claimant was admitted to the emergency room for a psychiatric evaluation. Ex. 8F/123. On exam, the claimant was anxious and angry. Nonetheless, she had normal speech and normal thought content, and normal memory. She was assessed with suicidal ideation. Ex. 8F/127, 130.

In August 2024, the claimant reported that she takes her medication every 2 or so days, but not every day. Ex. 20F/16. The claimant reported that her mood was stable and that she was learning to control her thoughts and trying to do a better job of redirecting her negative thoughts. Ex. 20F/16. She denied hopelessness, worthlessness and helplessness, paranoia and delusions. Ex. 20F/15. She reported being happy with her medication regimen and requested no changes. She had no current concerns. Ex. 20F/15. In December 2024, on exam, the claimant had a normal mood and normal behavior. Ex. 23F/9.

6

> Throughout the record, during exams, the claimant was oriented, had a normal mood, and normal behavior. Exs. 4F/128; 5F/7, 58; 6F/32, 145; 21F/39; 23F/9.

Tr. 27–29.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since September 6, 2023, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: spine disorders; osteoarthritis of knees; diabetes mellitus; obesity; hyperlipidemia; hypertension; and major depressive disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairment that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except for the following additional limitations: The claimant can lift and/or carry 20lbs occasionally and 10lbs frequently, sit for 6 hours; stand for 4 hours and walk for 4 hours; and push/pull as much as she can lift and/or carry. In addition, the claimant can

occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds, and can occasionally kneel, crouch and crawl. The claimant can never work at unprotected heights, or near dangerous moving machinery. She can understand, remember carryout, and complete simple instructions with no strict production rate pace requirements such as assembly line work. She can tolerate frequent and superficial interactions with supervisors, co-workers and the public, with superficial meaning, no arbitration, mediation, negotiation or being responsible for the safety of others. The claimant can adapt to routine workplace changes.

5.  The claimant has no past relevant work (20 CFR 416.965).

6.  The claimant was born on November 22, 1970, and was 52 years old, which is defined as an individually closely approaching advanced age, on the date the application was filed (20 CFR 416.963).

7.  The claimant has at least a high school education (20 CFR 416.964).

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy

that the claimant can perform (20 CFR 416.969 and 416.969a).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since September 6, 2023, the date the application was filed (20 CFR 416.920(g)).

Tr. 22–33.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

9

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920; *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of Review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*

*v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *Substantial evidence supports the ALJ's determination that Kovach can perform the described range of light work.*

Kovach first claims that the ALJ's RFC determination is not supported by substantial evidence because the ALJ rejected certain unspecified medical opinions, engaged in a selective review of the record, and did not "fully or

11

accurately address the objective evidence as a whole." Doc. 10, at 12. Additionally, Kovach appears to argue that the ALJ failed to properly consider certain medical opinion evidence under the applicable regulations. *Id*. at 12–13. Kovach's arguments, including her claim that the ALJ failed to properly evaluate certain medical opinions, fail for the following reasons.

As an initial matter, it is apparent that Kovach's first issue comes down to the argument that the ALJ should have weighed the evidence in her favor. This evident from the fact that aside from arguing that substantial evidence supports her desired outcome, she fails to explain what she thinks the ALJ did wrong. *See* Doc. 10, at 13–14.

Instead, Kovach claims that the fact that the ALJ didn't reach her preferred outcome must mean that the ALJ either "selectively parsed," meaning "cherrypick[ed]," the evidence, or simply failed to consider the evidence. *Id*. at 14; *see id*. at 11. The ALJ, however, said that he "consider[ed] … the entire record." Tr. 26. Because Kovach presents nothing to refute the ALJ's statement, the Court presumes that it is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

12

Further, an ALJ's failure to cite specific evidence does not mean that an ALJ failed to consider that evidence. *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for [her] decision to stand."). Indeed, a duty to "consider" the evidence is different than a duty to "discuss" the evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems– Akron v. NLRB*, 200 F.3d 436, 453 (6th Cir. 1999)). Afterall, ALJs aren't "require[d] … to discuss every piece of evidence in the record." *Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023); see Thacker, 99 F. App'x at 665. And this is why, although an ALJ may not "cherry-pick" facts to support a finding of non-disability by ignoring evidence that points to a disability finding, *see Gentry v. Comm'r*, 741 F.3d 708, 723–24 (6th Cir. 2014), cherry-picking-evidence arguments are "seldom successful," *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014) ("The District Court observed that this allegation is seldom successful because crediting it would require a court to re-weigh the evidence. It is no more availing on appeal.").

Kovach references the factors that an ALJ must consider when evaluating medical evidence. Doc. 10, at 12. In this regard, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the

following factors: supportability; consistency; treatment relationship, including the length, frequency, purpose, and extent; specialization; and other factors. 20 C.F.R. §§ 416.920c(a), 416.920c(c)(1)–(5). Supportability and consistency are the most important factors. 20 C.F.R. § 416.920c(a). Supportability means that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion[] … the more persuasive the medical opinions … will be." 20 C.F.R. § 416.920c(c)(1). Consistency means "[t]he more consistent a medical opinion[] … is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion[] … will be." 20 C.F.R. § 416.920c(c)(2). The Commissioner must explain the supportability and consistency factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). "[A]n ALJ need not," however, "specifically use the terms 'supportability' or 'consistency' in his analysis." *Cormany v. Kijakazi*, No. 5:21-cv-933, 2022 WL 4115232, at *3 (N.D. Ohio Sept. 9, 2022) (citing cases). The Commissioner is not required to discuss the remaining factors. *Id.* "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Here, Kovach does not point to any specific medical opinion that she believes the ALJ failed to properly evaluate or explain the way in which she

14

believes the ALJ failed to comply with regulations cited. Indeed, she does not specify any specific facet of the ALJ's evaluation of any particular medical opinion that was deficient. Instead, she simply states that she is "moving for remand" to allow for "evaluation of the persuasiveness of the evidence as a whole, including the Social Security examining physician Siddiqui and the findings of Plaintiff's treating and evaluating physical therapists." Doc. 10, at 12. Then, immediately after citing the opinion-evidence standard, Kovach provides a paragraph listing medical evidence and concludes that the evidence she cites:

> is consistent with the medical opinions in the record that [she[ can stand and walk for only four hours total in an eight-hour day (A.R. 79–80), sit two to three hours total in an eight-hour day (A.R. 2255), and needs an assistive device for gait and balance deficits (A.R. 2367, 2369, 2513).

Doc. 10, at 12–13.

This simply won't do. Kovach does not attempt to show how ALJ the allegedly failed to consider the supportability or consistency of any medical opinion. Kovach's argument demonstrates a fundamental misunderstanding of how the supportability and consistency factors are considered. The fact that the evidence that she cites might be consistent with her desired outcome, assuming that it is consistent, has nothing to do with whether the ALJ complied with the regulatory requirement that an ALJ discuss the supportability and consistency factors. *See* 20 C.F.R. § 416.920c(a). Indeed, Kovach's argument doesn't even amount to a dispute over the weight the ALJ

15

placed on certain evidence because Kovach doesn't explain how the ALJ allegedly erred. Further even if she had, it is for the ALJ, not Kovach or the Court, to weigh the evidence. *See* 20 C.F.R. § 404.1520c(a) (explaining how *the ALJ* will consider and weigh medical opinions and prior administrative medical findings) (emphasis added); *see also Rottman v. Comm'r of Soc. Sec.*, 817 F. App'x 192, 196 (6th Cir. 2020 ("[T]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job.") (citation omitted); *see also* Doc. 10, at 11 (recognizing that the RFC assessment is reserved to the ALJ).

Finally, like many Social Security plaintiffs, Kovach references a *logical bridge* as if there is a special obligation for a Social Security ALJ to "build an accurate and logical bridge" between his analysis and conclusion. Doc. 10, at 14. This reference to a *logical bridge* apparently first appeared in this Circuit in *Allshouse v. Commissioner of Social Security*, No. 07-12516, 2008 WL 4372646, at *9 (E.D. Mich. Sept. 19, 2008), which relied on Seventh Circuit precedent. But the idea that an adjudicator's logic should be discernible is not a special feature of Social Security cases. Indeed the line of Seventh Circuit precedent from which the phrase emerged began outside the Social Security context as metaphor to make the generally applicable point that a court "cannot defer to something that is not based on facts–logical facts—in the record." *J.C. Penney Co. v. NLRB*, 123 F.3d 988, 996 (7th Cir. 1997) ("we can only defer to the ALJ's findings when the reasons for his decision build an

16

accurate and logical bridge between the evidence and the result. Here, the bridge is out."). So the idea behind the metaphor is not a doctrine. Rather it is a truism. It also, in Kovach's instance, does not provide a basis for remand because she does not show that the ALJ's decision was not supported by substantial evidence. *See Warner*, 375 F.3d 387, 390 (6th Cir. 2004).

Kovach's first issue presented does not support remand.

*2.    The ALJ did not err by finding Kovach capable of performing frequent social interaction.*

In her second issue, Kovach claims that the ALJ's analysis amounted to "impermissible cherry-picking," Doc. 10, at 15–16, and ultimately summarizes her argument as one claiming that "the ALJ did not adequately identify his reasoning for his RFC of Plaintiff, and minimized contrary evidence of consistent functioning by stating Plaintiff was cooperative during exams," *id*. According to Kovach, these errors led to the ALJ's finding that Kovach was capable of frequent—as opposed to occasional—and superficial interaction with others. *Id*. at 15.

Here, the ALJ remarked that:

> In interacting with others, the claimant has a moderate limitation. Despite her depression, the claimant reported that she spends time with others in person, on the phone and by video. Ex. 5E/9. During exams, the claimant was cooperative, had normal speech, made good eye contact, and had normal thought content. Exs. 7F/33; 8F/127, 131.

Tr. 25. Later, he noted:

> In January 2024, notes indicated that the claimant's mental health was managed by her primary care

17

physician. On exam, the claimant was oriented, had normal language, and poor concentration, Ex. 1F/9, 12. In February 2024, the claimant had a Patient Health Questionnaire-9 score of 9 indicating mild depression. Ex. 6F/32. In March 2024, the claimant was admitted to the emergency room for a psychiatric evaluation. Ex. 8F/123. On exam, the claimant was anxious and angry. Nonetheless, she had normal speech and normal thought content, and normal memory. She was assessed with suicidal ideation. Ex. 8F/127, 130.

. . . .

With regard to the claimant's mental health, limiting the claimant to simple instructions with no strict production rate pace, frequent and superficial interactions with others, and routine workplace changes, accounts for the claimant's depression. Greater limitations are not warranted. The record indicates that the claimant was not always compliant with her medication regimen. Although the claimant had an inpatient stay for mental health in March 2024, her mental status has stabilized since that time. Further, despite her depression, during mental status exams, the claimant was generally oriented and had a normal mood and normal behavior. Exs. 1F/9,12 ; 4F/51, 128; 5F/7, 58; 6F/32, 145; 8F/123, 127, 130; 20F/15-16; 21F/39; 23F/9; hearing testimony.

Tr. 29.

Finally, the ALJ concluded:

State psychological consultants at the initial and reconsideration levels found that the claimant could understand, remember and carryout simple 1-2 instructions; concentrate, persist and maintain a pace to carry out a simple learned routine in a structured and predictable work setting, interact with supervisors, co-workers and the public occasionally and superficially; and function in an environment where day to day job duties are

18

> consistent and changes can be explained in advance. Exs. 2A/8-9; 4A/7-8. The findings of the consultants are generally persuasive. The findings are supported with a detailed summary and analysis of evidence reviewed. Moreover, the consultant's findings are generally consistent with the medical evidence of record of the claimant's impairments. Although the consultants found that the claimant could occasionally and superficially interact with others, a finding that the claimant can frequently interact with others is more consistent with the medical evidence of record. In particular, during mental status exams, the claimant was cooperative, had normal speech, and a normal thought content. Exs. 1F/9,12; 4F/51, 128; 5F/7, 58; 6F/32, 145; 8F/123, 127, 130; 20F/15-16; 21F/39; 23F/9; hearing testimony.

Tr. 31.

Based this analysis, Kovach says that the ALJ engaged in "impermissible cherry-picking" in failing to limit her to occasional interactions with others. Doc. 10, at 15. According to Kovach, the ALJ failed to account for the state psychological consultant's opinions and her hospital admission, during which she "was agitated, anxious, angry, impulsive, had suicidal ideation," and experienced hallucinations. *Id*. at 15. As an initial matter, this argument can't be squared with the portions of the ALJ's decision quoted above, in which he discusses the evidence that Kovach references.

In fact, as Kovach acknowledges, the ALJ did not find the state psychological consultant's opinions were fully persuasive; rather, he found them "*generally* persuasive." Tr. 31 (emphasis added); *see also* Doc. 10, at 15. The ALJ explained that he determined that "[a]lthough the consultants found

19

that [Kovach] could occasionally and superficially interact with others, a finding that the claimant can frequently interact with others is more consistent with the medical evidence of record." Tr. 31. The ALJ continued, citing various mental status exam findings and Kovach's hearing testimony. *Id.* So there is no basis to say that the ALJ ignored the evidence to which Kovach points.

Further, as discussed as to Kovach's first issue, claims that the ALJ "cherry-picked" or "minimized contrary evidence" do not provide a basis for remand and instead illustrate that Kovach's argument amounts to a disagreement with how the ALJ weighed the evidence. *See* Doc. 10, at 15–16. Kovach's strategy of citing evidence that she believes the ALJ dismissed does not support remand because even if the ALJ failed to cite the evidence that Kovach cites, an ALJ need not cite the entire record or every piece of evidence in support of his conclusion in order to reach a result supported by substantial evidence. *See e.g.*, *Thacker*, 99 F. App'x at 665; *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022) ("Although Plaintiff understandably disagrees with the ALJ's decision, the law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC. And … the ALJ cannot be expected to discuss every piece of evidence that Plaintiff believes is inconsistent with the RFC."), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022).

Entertaining Kovach's argument would require that the Court accept Kovach's weighing of the evidence over the ALJ's—a proposed weighing that

does not account for the medical evidence noted above by the ALJ which contradicts Kovach's account. But the task of weighing the evidence falls on the ALJ, not Kovach or this Court. *See Rottman*, 817 F. App'x at 196.

In sum, none of the arguments raised in support of Kovach's second issue provide a basis for remand.

**Conclusion**

For all of the reasons stated, I affirm the Commissioner's decision.

Dated: June 9, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

21